### FREAR v. LEWIS et al.

(Supreme Court, Appellate Division, Second Department. January 22, 1915.)

1. PARTNERSHIP (§ 262*)—DISSOLUTION BY MUTUAL CONSENT—ACQUIESCENCE IN ATTEMPTED DISSOLUTION.

Though, where copartnership articles provided that the partnership should continue until mutually dissolved in writing, the partnership was not one for an undefined time, where, after one of the partners gave notice to the other that the partnership was dissolved, the other partner sent out cards and letters stating that the partnership had been dissolved, he thereby consented to a dissolution, and the partnership was then dissolved.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 602, 605, 606; Dec. Dig. § 262.*]

2. PARTNERSHIP (§ 300*)—DISSOLUTION—ACCOUNTING—GOOD WILL.

Where one member of a firm of insurance agents expelled the other from the firm's place of business, locked the door against him, deprived him of the books and of access to customers at the place of business, and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

wrongfully took exclusive possession of the business and property of the firm and of its opportunities for doing business, and thereby appropriated the good will of the business, he was bound to account to the other partner for the value of the good will.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 692–697; Dec. Dig. § 300.*]

Appeal from Special Term, Kings County.

Action by Frank B. Frear against Alfred H. Lewis and another. From an interlocutory judgment, plaintiff appeals. Modified and affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and PUTNAM, JJ.

J. Noble Hayes, of New York City, for appellant.
Robert H. Elder, of New York City, for respondents.

THOMAS, J. In 1890, Frear, plaintiff, then about 28 years of age, and somewhat experienced in the business of insurance, became an equal partner of the defendant Lewis, then some 18 years of age, by purchasing a half interest in the business of Lewis' father. The gross premiums at that time were about $17,000 for the year. In 1901, second articles of copartnership were executed by the parties, and the gross premiums, at that time $221,010.12, increased until, for the year 1908, they were $309,362.25. In 1901 and the following years, there were divided sums advancing from $12,800 in that year to $41,500 in 1907 and declining to $18,300 in 1908. I do not consider whether the money divided as profits was in full degree earned, but it is sufficient at present that the business as a whole prospered. The business was located at 145 Montague street, Brooklyn. Frear was in immediate control of the office, while Lewis devoted himself largely to matters out of the office. There were such bookkeepers and clerks as the business demanded. All the receipts were reported to the bookkeeper by Frear and then returned to him for the purpose of deposit in bank, and the checks were, with few exceptions, signed by him until about September, 1908, when some dissatisfaction with his conduct resulted in both partners signing the checks for a short time, and thereafter that service fell to Lewis alone. The earlier companies represented by the firm of Lewis & Frear seem largely to have disappeared, and usually without specific fault of the partners or either of them. The new companies acquired were largely brought in by Frear's immediate negotiations and to some extent by his personal connections. Times came when Frear reported that the firm needed money to meet the due, and in cases overdue, premiums payable to the companies. In such exigencies Frear, who seems to have been personally neither saving nor financially resourceful, was not able to contribute in money, but Lewis at one time loaned the firm $4,000, of which some $3,000 is unpaid, and in another instance bought the firm's interest in some real estate owned by it for the sum of $15,000, which was paid into the company. There are some indications that Frear made tardy payment of premiums collected, whereby the business was harmed. In any

case, Lewis so conceived, and as he says, and as Frear denies, Lewis warned him that a dissolution would be necessary if the firm continued to lose companies. Frear seems to have had premonition of changed relations, as he suggested on two occasions such expected happening and a new partnership with clerks. On March 1, 1909, Lewis served on Frear a notice of dissolution as of that date, and repeated on March 6th notice of dissolution as of the former date. After the service of the first notice, before March 6th, Frear sought to obtain for himself alone the agency of a company then represented by the firm; but Lewis, also soliciting, obtained it for Lewis & Gendar, a new firm formed. On March 6th, Frear went to his office and took from the safe papers that belonged to him personally, or to the firm, among other things checks drawn by him to the firm, and reported to the bookkeeper. Upon attempting to go out he was opposed by Lewis and some of his assistants, and the papers forcibly taken from him, and the keys of the office exacted, and later the door was locked against him. For this plaintiff sought to show that he brought action and recovered a substantial verdict. It is contended by appellant that the judgment roll in the former action, not here admitted, would prove that the firm was not dissolved on March 1st or on March 6th, as that issue was proffered even by defendant and presumably decided against him. Even if it were admissible for that purpose, it is not needed.

[1] The articles of copartnership provide: "That the said copartnership shall continue until mutually dissolved, in writing."

In Moss v. Elphick, English Law Reports, vol. 1 [1910], K. B. Div. 465; Court of Appeal, 846, the question arose upon a stipulation that the copartnership shall be terminated "by mutual arrangement only"; but the plaintiff attempted to dissolve it by notice. It was urged in his behalf that under the Partnership Act, 1890 (53 and 54 Vict. c. 39, §§ 26, 32), the partnership was for "no fixed term," and that it was "for an undefined time" and could be terminated by notice of one of the partners; but that view was rejected, and it was decided that it could be dissolved only by mutual arrangement, as provided by the partnership agreement. The judgment was affirmed in the Court of Appeal. The case is authority at least so far as this: That the present partnership was not for an undefined time. But in Karrick v. Hannaman, 168 U. S. 328, 18 Sup. Ct. 135, 42 L. Ed. 484, it was said in effect that, even when the articles provide "that the partnership shall continue for a certain period, the partnership may be dissolved at any time, at the will of any partner, so far as to put an end to the partnership relation and to the authority of each partner to act for all; but rendering the partner who breaks his covenant liable to an action at law for damages, as in other cases of breaches of contract." It was further written:

"In a court of equity, a partner who, after a dissolution of the partnership, carries on the business with the partnership property is liable, at the election of the other partner or his representative, to account for the profits thereof, subject to proper allowances."

In that case the defendant undertook, before the expiration of the partnership by its terms, to dissolve it, and excluded his copartner from

any participation in the business or profits, and it was decided that, irrespective of the question whether he had dissolved the relation, he should account to the copartner for his share of the property and of the profits according to the agreement. That case is similar to the present one. But as early as April 1st following Lewis' notice and seizure of the business, Frear sent out cards and letters stating that the partnership had been dissolved. Such acts were equivalent to a written consent to the dissolution of the partnership, and it is equitable for the purposes of the accounting to regard April 1, 1909, as the date of the dissolution.

[2] Frear's efforts were feeble and ineffective against Lewis & Gendar, who by Lewis' strong hand had taken the office and the entire equipment and facilities by which the business of Lewis & Frear had been conducted. Whatever Frear's shortcomings as a partner, he was ousted ruthlessly by Lewis from an office where he had a full right to be, and from books and association with customers to which he was entitled to access common to both partners. Lewis, having seized, held whatever he could for the use of Lewis & Gendar. Later, on February 16, 1910, Lewis was authorized in this action upon filing a bond for $10,000 "to continue the business of said copartnership of Lewis and Frear, during the pendency of this action." Has Lewis since that time continued the business of the copartnership, or has he appropriated it to Lewis & Gendar? Lewis says:

"I am carrying on the business in the same place, and with many of the customers, and with some of the companies."

He certainly has been aided by the property and facilities of the old firm. So Lewis cast out Frear, seized the plant, prevented a receivership, became the person to continue business, and has absorbed for his new firm the business, except so far as companies and customers have fallen away. It is impossible to conceive that such opportunities of location of a long-established business, together with the books, have not carried a valuable good will to the new firm. Indeed, the testimony of Lewis shows that he was anxious to retain the business, and that the good will was valuable. Metz supports that conclusion. It appears that the expiration book in itself is a valuable possession, and Lewis has it—first by illegal seizure, later by designation for the continuance of the business of Lewis & Frear. But such continuance has been, as it would inevitably be, by the rude seizure of the office thwarted, and the business has been measurably carried to Lewis & Gendar. With that firm seated in the place of Lewis & Frear, the business would seek them, even if they did not seek the business, as they have done. Metz says that there would be no good will upon the assumption that the business was "split up by the separation of the partners"; but he adds that the good will would continue with the partner that had appropriated it, a seemingly self-evident conclusion. That is what Lewis through himself and his new firm has done. It is true that Frear, shut out, tried to hold some of the business; but his attempt, while theoretically an impairment of the good will, in fact was pitifully trivial and unproductive. Lewis took the substance of the business. It has a value which this court should protect. Lewis may have had cause for

discontent, or even exasperation, towards his partner; but that does not excuse. He took and has something of value and should account for it. The copartnership, for the purposes of the accounting, was not dissolved on March 1 or March 6, 1909; but thereafter, on April 1st, Frear consented to dissolution. He was expelled from the firm's place of business; the door was locked against him; he was deprived of the books and of access to customers at the place of business; Lewis wrongfully took exclusive possession of the business and property of the firm and its opportunities for doing business, and thereby appropriated the good will of the business. The value of the good will so taken and used by him should be ascertained, and he should be charged therewith. The value must be determined in view of all the circumstances.

The interlocutory judgment, together with the findings, should be amended in accordance with this opinion, and as so amended affirmed, with costs to appellant, payable from the assets of the firm, if there be such, and without costs to the respondent Gendar. All concur.